**Gene V. HAVERLAH, Plaintiff-Appellee,**

v.

**MEMPHIS AVIATION, INC. and Herbert Grubb, Defendants-Appellants.**

Court of Appeals of Tennessee, Western Section, at Jackson.

Feb. 29, 1984.

Application for Permission to Appeal Denied May 29, 1984.

Dewitt M. Shy, Jr., Memphis, for plaintiff-appellee.

Duncan Ragsdale, Memphis, for defendants-appellants.

CRAWFORD, Judge.

In this nonjury case the defendants, Memphis Aviation, d/b/a Hi-Air, and Herbert Grubb, appeal from the decree of the Chancery Court in favor of the plaintiff, Gene V. Haverlah.

The plaintiff's Second Amended Complaint alleges in substance that plaintiff is a resident of Texas and defendant, Hi-Air, sells and services aircrafts in Memphis, Tennessee; that, in the early part of November, 1978, plaintiff purchased from defendant, Hi-Air, a 1978 Cessna 172 aircraft for the price of $25,033.00; in negotiations leading up to the purchase of the aircraft defendant, Grubb, employee and agent of Hi-Air, represented and warranted to plaintiff that the aircraft was new, had never sustained any damage and was not affected by any directives from the FAA regarding its airworthiness; in reliance on the representations plaintiff came to Memphis on November 2, 1978, to take delivery, which he did after considerable delay, and on the return flight to Texas the aircraft failed to function properly in several respects; on November 3, 1978, plaintiff was contacted by defendant Grubb and informed that the said aircraft was in fact subject to an airworthiness directive of the FAA requiring repairs and/or replacement of the crank shaft gears; upon learning this, the plaintiff stated to Grubb that this was not in conformity with the representations, and he desired to cancel the purchase and return the aircraft to defendants, but Grubb refused to accept the return of the aircraft stating that the replacement work was minor and could be performed within ten days; because of the refusal of defendants to voluntarily accept return of the aircraft and in reliance upon defendant's assertions and representations regarding the replacement and general engine work to be performed, the aircraft was returned to the defendants, but defendants failed to repair and return the aircraft in the manner which they represented, and plaintiff refused to accept delivery of same; the complaint further avers that defendants, Hi-Air and Grubb, fraudulently and/or negligently represented to plaintiff that there were no airworthiness directives regarding the aircraft and these representations were relied upon by plaintiff to his detriment; that the engine was in a defective condition and caused economic, pecuniary and property damage to the plaintiff; plaintiff further avers that defendants breached express and implied warranties pertaining to the condition, merchantability and fitness of the said aircraft, and specifically breached the express and implied warranties provided for in Tenn.Code Ann. § 47–2–313, 314 and 315. As an additional cause of action plaintiff alleges that the conduct of the defendant constituted unfair and/or deceptive acts or practices in violation of Tennessee Consumer Protection Act of 1977. The relief sought by plaintiff was rescision and return of purchase price, prejudgment interest incidental damages and attorneys fees.

Defendants, Hi-Air and Grubb, filed a joint answer admitting that Grubb was the

agent and employee of Hi-Air and joining issue on the remaining material allegations of the complaint. The answer specifically avers that there was no misrepresentation, but in fact the sole inducement for the contract to purchase was the price of the aircraft. The defendants further aver that the plaintiff is guilty of laches asserting that plaintiff did not revoke the purchase promptly but dealt with the aircraft after learning of the alleged misrepresentation so as to indicate a willingness to be bound by the contract. In addition, it is averred that the delay in unconditionally revoking the contract caused defendants to change their position regarding the aircraft to their detriment.

Although there were no written findings of fact the trial court found that defendant Grubb as the employee and agent of Hi-Air made material misrepresentations of fact to plaintiff which induced plaintiff to purchase the aircraft and accordingly rescinded the contract of purchase and entered judgment for plaintiff against both defendants in the total amount of $55,630.85 which was composed of $25,048.00 for the original purchase price paid, $10,135.85 for 10% prejudgment interest from November 2, 1978, to entry of judgment, $2,808.00 storage expense, $1,963.00 maintenance work, $2,765.00 for insurance, $168.00 for airline tickets for plaintiff and pilot to take original delivery, $11,272.00 for attorney fees and expenses in the litigation, and $1,526.00 for fees and expenses of expert witnesses.

Defendants have presented several "issues" for review by the court but we perceive only two real issues which we will now consider.

## ISSUE NO. I

Whether the evidence preponderates against the finding of the trial court that a material misrepresentation induced plaintiff to enter into the contract and whether plaintiff was entitled to rescission of the contract if misrepresentation is found.

Defendants assert (1) that defendant Grubb did not make material misrepresentations, (2) that plaintiff was not induced to purchase the airplane by any such representations but the sole inducement was the price of the airplane, and (3) that even if there were material misrepresentations plaintiff is not entitled to rescission because of his actions upon learning of such alleged misrepresentation.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

The evidence before the court concerning this issue is primarily the testimony of plaintiff and the testimony of defendant Grubb. Plaintiff testified that after seeing advertisements he contacted Hi-Air by telephone on or about October 30, 1978, and talked to Mr. Grubb. On the first telephone contact they discussed in general Skyhawk Aircraft and the prices. He called Mr. Grubb a second time and asked him if the planes were new, if they had ever been damaged, or if they had had any airworthiness directives (A.D.) against them. He stated that Grubb's response was, "Yes, they were new. They had not been damaged. These planes have no A.D.'s against them." The conversation then proceeded about the description of the particular airplane in question, the options available and the price. All of these negotiations took place by long distance telephone and he relied on Mr. Grubb's representations concerning the plane. In the last telephone conversation they agreed upon putting the radio in and including it in the purchase price and that $5,000.00 was a suitable deposit to be wired to Grubb. Arrangements were made to take delivery on November 2, and accordingly plaintiff, along with Mr. Wall, a pilot, arrived to pick up the plane as scheduled. The purchase price previously agreed upon was $25,048.00 and he signed a purchase order con-

firming this although he understood that it was a receipt for the monies given for the plane. The installation of the radio equipment was not completed and while waiting for the plane he had further discussions with Grubb and again Grubb was asked if there were any A.D.'s on the plane or if the plane had ever been damaged. He was furnished the log books, none of which contained any information concerning A.D.'s or damages. He and his pilot left Memphis to fly the plane back to his home in Texas and noticed that the plane did not perform properly, that it was acting in a rather sluggish manner and various other parts of the equipment did not work properly. The next morning after arriving from Memphis he received a long-distance telephone call from Grubb and was then advised that there was in fact an A.D. on the plane rendering the plane unairworthy and that it should not have been flown from Memphis to Texas in its present condition. When he received this information from Grubb he responded that this was not in accord with the representation made to him by Grubb and that he therefore wanted his money back. Grubb explained to him that the plane needed to be repaired and wanted to arrange for the plane to be picked up for repair to which he agreed, but not for him to retake possession of the plane after the repairs. He stated that he still maintained that he wanted his money back, but, "I let him pick up the plane because it had to be repaired or complied with to make it airworthy. I did not want the plane, but whoever would have the plane would have to have it airworthy to keep it. That is the reason I let them pick it up." He further testified that during this period of time he talked by long distance telephone with a Mr. Quackenbush of Cessna Aircraft who advised him that the crankshaft repair would make the plane as good as new. At that time he asked Quackenbush why he could not have a new engine put in the plane. He was not advised by defendant when the aircraft was returned to the airport in Texas, but learned from someone at the airport that the plane had been left there. Shortly before he learned this, he talked again by telephone to Grubb and again told Grubb that he wanted his money back and Grubb's response was that he would get back in touch with him. He did not hear further from Grubb, and then turned the airplane over to Victor Teach at You Dee Aviation, Beeville, Texas, to keep it in storage and do what maintenance was necessary to prevent deterioration while it was in storage. He never licensed the plane with FAA nor did he fly it again. This suit was filed April 10, 1979. Plaintiff was quite emphatic that if he had known that the plane was subject to the airworthiness directive concerning the crankshaft and that the repair would entail replacing the crankshaft he would not have purchased the plane.

Grubb testified he had many years experience as an aircraft salesman and was an FAA certified commercial pilot. His first conversation with plaintiff was the last part of October, 1978, by long distance telephone when the plaintiff inquired about a Cessna Skyhawk aircraft. They discussed the planes that were presently in inventory. Plaintiff's primary concern was the price, although they did discuss the radio equipment available. It was also on this same date and in the same conversation that plaintiff agreed to buy the aircraft. Grubb believes that this was the only conversation he had with the plaintiff prior to the date that plaintiff arrived to pick up the aircraft, but there may have been another conversation. Grubb was never asked by plaintiff about any prior damage to the aircraft nor was he asked about whether there were any A.D. notes concerning the aircraft. The $5,000.00 down payment was agreed upon in the telephone conversation and was to cover the radio package which was to be installed in the airplane by Aero Electronics. On the date the plaintiff came to Memphis there had been a delay in the installation of the radio package, and although he cannot remember the discussion he had with plaintiff, he has no recollection of plaintiff asking him whether there were any A.D. notes

against the aircraft. He requested plaintiff to sign the retail purchase order and made no representations concerning that paper. They had no discussion concerning the annual inspection almost due on the aircraft, and he made no representations to plaintiff whatsoever that there were no A.D. notes on the aircraft, nor did he tell plaintiff that the aircraft had not been previously damaged. He does not recall any conversation with the man who accompanied the plaintiff to pick up the airplane or that he was present at any time when he and plaintiff were discussing the transaction. In going over the paper work after the plaintiff had taken the plane he remembered the Cessna program concerning several dificiencies in the aircraft engine and decided to check to see if there were any A.D.'s from the FAA. He found that there were A.D.'s against this particular plane which had not been taken care of. He called the plaintiff the next morning after the plane was picked up and explained to the plaintiff that he would pick the airplane up and bring it to Memphis to comply with the A.D.'s and then redeliver it. He stated that the plaintiff's response was to the effect that this arrangement was agreeable with him, and he had no idea that plaintiff was dissatisfied. He denies that plaintiff asked for his money back. He thinks that there may have been other telephone conversations with plaintiff while the airplane was being repaired in Memphis, but he cannot recall the details. He states that the value of the aircraft as delivered to the plaintiff was $25,048.00, which represents the agreed upon price.

■ As noted, it is undisputed that the aircraft in question was subject to an airworthiness directive from the FAA which rendered the aircraft unairworthy until the necessary repairs were made. It is undisputed that plaintiff took the aircraft from Memphis, Tennessee, and flew it to his home in Texas unaware of any such A.D.'s and unaware that the aircraft was not airworthy. The sharp line of dispute as the above testimony indicates is what Grubb told plaintiff and what induced plaintiff to agree to purchase the aircraft. Plaintiff

says Grubb told him there were no A.D.'s against the aircraft. Grubb says he did not tell plaintiff anything about any A.D.'s. The Chancellor had these witnesses before him as they testified and had the opportunity to observe their manner and demeanor as he listened to the oral testimony. Obviously his decision concerning the misrepresentation was largely dependent upon the credibility of witnesses and any conflict in testimony requiring a determination of the credibility of witnesses rests in the first instance with the trial court and will be given great weight by the appellate court, unless other real evidence compels a contrary conclusion. *See State ex rel. Balsinger v. Town of Madisonville,* 222 Tenn. 272, 282, 435 S.W.2d 803, 807 (1968); *Linder v. Little,* 490 S.W.2d 717, 723 (Tenn. App.1972). We find no other evidence in that category, and therefore, defendants' assertion that no misrepresentations were expressed that induced plaintiff to purchase the aircraft is without merit.

■ Defendants also assert that a representation concerning the A.D.'s involving the crankshaft is not a material misrepresentation to warrant rescission. The sale of the aircraft in this case is a "transaction in goods" and therefore is controlled by the Uniform Commercial Code, Tenn.Code Ann. § 47–2–101 *et seq.* Tenn.Code Ann. § 47–2–608 (1979) for all practical effect replaces the old equitable doctrine of rescission and provides:

*Revocation of acceptance in whole or in part.*—(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it:

(a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as he had rejected them.

The question becomes did the A.D. substantially impair the value of the aircraft to the plaintiff? Plaintiff's witness Victor Teach testified that the effect of the A.D. concerning the crankshaft assembly was to reduce the value of the aircraft from $25,-000.00 to approximately $12,000.00, and that even if the crankshaft assembly was repaired properly, the value would not exceed $14,000.00. His justification for this testimony was premised on the fact that the engine had to be opened or split to replace the crankshaft and such an operation could result in deterioration of the engine and possibly require a complete overhaul in the future. On the other hand, defendant introduced several witnesses equally as well or perhaps more qualified than Teach who testified that the A.D. would not affect the value of the aircraft once it was repaired. The Chancellor commented that he thought Teach made an excellent witness. Of course, the Chancellor observed Teach as he was testifying from the stand and has a distinct advantage over this court in that respect. However, even though this court does not profess to be authority on the value of aircraft we have difficulty accepting testimony that places the value of a $25,000.00 aircraft at $12,000.00 because of a defect in the engine, which itself has a list price of only $5,840.00. Needless to say, we are not impressed with Mr. Teach's testimony as to the value. We also look somewhat askance at the witnesses introduced by defendants that lightly shrug off an airworthiness directive of the FAA which has grounded the aircraft and involved major corrective repair work to a so-called "brand new engine."

On the question of substantial impairment of value we find Cessna's attitude as reflected in the record to be quite persuasive. The crankshaft gear assembly problem that caused the FAA to issue the A.D. was recognized by Cessna at an early date, and instructions were issued to its dealers as to how to correct the problem. The dealers were given two options: (1) to install a new engine or (2) install a new crankshaft assembly. Option 1 was to be used by the dealer on customer aircraft with 100 hours or less time in service and within the six month warranty period. (The aircraft in question qualified under both requirements.) Cessna would provide the new engine and allow its dealers 20 hours of labor charge for installing the engine. Option 2 was to be used by the dealer on customer aircraft that had more than 100 hours time in service or were out of warranty. Cessna would provide the parts and allow 36 hours labor. In order for a dealer to obtain the parts and labor under this program the work must have been completed by October 1, 1978, and this situation explains the failure of defendants to install a new engine.

Authorizing a new engine with its attendant expense indicates to this court that Cessna considered the problem a major problem. Monetary value or cost of repair is certainly a factor to indicate substantial impairment of an object. *See Moore v. Howard Pontiac-American, Inc.,* 492 S.W.2d 227 (Tenn.App.1972). We also believe substantial impairment can be present although the cost of repair or reduction in monetary value does not appear extensive. In the case before us plaintiff wanted and bargained for a brand new aircraft which could be legally flown without the necessity of taking the new engine apart. We don't find this to be an unreasonable desire on the part of the plaintiff. The statute authorizing revocation of acceptance requires only that there be substantial impairment of value to the buyer. The fact remains that the crankshaft gear assembly in the aircraft in question result-

ed in an airworthiness directive that grounded this aircraft. No one can doubt that immense safety factors are involved in the use of aircraft, and hence the industry is subjected to stringent regulations. Cases in other jurisdictions have held that substantial impairment of value within the meaning of UCC § 2–608(1) exists when the nonconformities in the goods are such that they shake the buyer's faith in the ability of the goods to perform the function for which they were purchased. See cases collected in 98 ALR3d 1183, at 1194. As the annotation points out, one of the cases "expressed the view that once a person's faith is shaken in a major investment such as an automobile, the vehicle not only loses its real value in the buyer's eyes, but also becomes an article whose integrity has been substantially impaired and whose operation is fraught with apprehension." This statement is even more appropriate for the aircraft involved in this case. One's apprehension involving an automobile could be to get out to walk for help, but one's apprehension involving an aircraft could be to never get out to walk again. Accordingly, we find without merit the defendant's assertion that no material misrepresentation exists.

The defendants also contend that plaintiff should not be allowed to rescind or revoke acceptance, because he did not act promptly. We disagree with defendants and point out that plaintiff advised defendant Grubb immediately upon learning of the airworthiness directive he wanted his money back. On a later occasion he again stated to Grubb he wanted his money back and Grubb's response was that he would get back in touch with plaintiff, but Grubb never did. Failing to hear from Grubb, plaintiff did not continue using the aircraft, nor did he even license the aircraft with the FAA. Instead, he stored the aircraft in facilities and under conditions to maintain its integrity pending the outcome of this litigation. Tenn.Code Ann. § 47–2–608 requires that revocation of acceptance occur within a reasonable time after discovering the grounds for it and is not effective until the buyer "notifies" the seller. Tenn.Code

Ann. § 47–1–201 General definition (26) provides in part:

A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it.

We feel that the actions of the buyer stating that he wanted his money back and in storing the plane awaiting word from the seller conforms with notification required under the Code. Accordingly, we find defendants' assertions in this regarding without merit.

Defendants do not dispute that a person may be entitled to rescind a contract on the basis of misrepresentation and while the testimony of all parties in the suit leaves a great deal to be desired, the chancellor determined that there were misrepresentations, that the misrepresentations were material, that they induced plaintiff to enter into the contract and that plaintiff acted promptly to seek rescission upon learning of the misrepresentation. We cannot see that the evidence preponderates against the findings of the chancellor in this regard, and therefore rescission was properly decreed in this case.

### ISSUE NO. II

Whether the trial court correctly awarded damages for the items set out in the decree.

As noted in the Comments to Official Text, Tenn.Code Ann. § 47–2–608, "Although the prior basic policy is continued, the buyer is no longer required to elect between revocation of acceptance and recovery of damages for breach. Both are now available to him."

Tenn.Code Ann. § 47–2–721 (1979) provides:

*Remedies for fraud.*—Remedies for material misrepresentation or fraud include all remedies available under this chapter for nonfraudulent breach. Neither rescission or a claim for rescission of the

contract for sale nor rejection or return of the goods shall bar or be deemed inconsistent with a claim for damages or other remedy.

Tenn.Code Ann. § 47–2–715 (1979) provides in part:

*Buyer's incidental and consequential damages.*—(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

It is clear that this last quoted statute authorizes the court to award expenses incurred by the plaintiff in protecting the property involved, and defendants do not seriously contest this award. Defendants primarily assert that the award for pre-judgment interest, attorneys fees and litigation expenses is not correct.

■ Prejudgment interest is authorized by Tenn.Code Ann. § 47–14–123 (1979) and is discretionary with the court. *B.F. Myers & Son of Goodlettsville, Inc. v. Evans,* 612 S.W.2d 912 (Tenn.App.1980). Defendants contend that the court abused its discretion by awarding prejudgment interest, because plaintiff allowed the Cessna warranty to expire without the necessary repairs being made by Cessna contrary to plaintiff's agreement. In addition, defendants contend that they did not have the money earning interest at the expense of the plaintiff, as is usually the case in the award of prejudgment interest. Although we agree with defendants concerning plaintiff's conduct regarding the warranty, we will deal with that matter hereafter. Our review of the record does not reveal otherwise that there has been an abuse of discretion by the chancellor. Accordingly, we find nothing improper in the award of prejudgment interest.

We agree with defendants' assertions that attorneys fees cannot be awarded without statutory or contractual authority.

However, defendants overlook that plaintiff also grounded his suit on a violation of the Tennessee Consumer Protection Act of 1977, Tenn.Code Ann. § 47–18–101 (1979) *et seq.*

■ The Act is to be liberally construed to protect consumers and others from those who engage in deceptive act or practices. Tenn.Code Ann. § 47–18–102(b). The definitions contained in the Act include: " 'Knowingly' or 'knowing' means actual awareness of the falsity or deception, but actual awareness may be inferred where objective manifestations indicate that a reasonable person would have known or would have reason to know of the falsity or deception." Tenn.Code Ann. § 47–18–103(e).

■ The Act declares unlawful deceptive or unfair trade practices. Tenn.Code Ann. & 47–18–104(a). Included among the acts declared unlawful are, "Representing that goods are original or new if they are deteriorated, altered to the point of decreasing value...." Tenn.Code Ann. § 47–18–104(b)(6), and "Representing that goods ... are of a particular standard, quality or grade...." Tenn.Code Ann. § 47–18–104(b)(7). The representation of Grubb on behalf of his employer Hi-Air violated each of these provisions.

In *Brungard v. Caprice Records, Inc.,* 608 S.W.2d 585 (Tenn.App.1980), suit was brought for rescission and for damages under the Tennessee Consumer Protection Act of 1977. In affirming the trial court decree for rescission and the award of attorneys fees and treble damages provided in the Act, the court said:

T.C.A. § 47–18–109 confers a private right of action on an individual who suffers an ascertainable loss as a result of an unlawful practice under the Act. A plaintiff's recovery is normally limited to actual damages and reasonable attorney's fees, but if the violation was willful and knowing, the court may award treble damages.

*Id.* at 591.

■ No one has suggested in the case before us that treble damages should have

been awarded, but *Brungard* points out that deceptive and unlawful practices do not necessarily have to be willfully and knowingly made. Defendants did not contest and apparently concede that the amount awarded for attorneys fees is not excessive, so we do not have that issue before us. Under the circumstances, we cannot find that the trial court abused its discretion in awarding attorneys fees and expenses of litigation pursuant to the authority conferred by the Act.

We now must consider defendants' assertion which we have previously alluded to concerning plaintiff's failure to obtain warranty repairs from Cessna before the warranty expired, while agreeing to obtain the repairs.

The record reflects that shortly after the suit was filed, the attorney for defendants wrote to the attorney for the plaintiff advising that the warranty from Cessna was in effect until May 2, 1979, and that if repairs were necessary it would be to the best interest of plaintiff and defendants to have the aircraft properly repaired under the warranty. The letter continued

I respectfully insist that this aircraft be taken in the Cessna dealer in the Texas area. In the event no one is available to repair the aircraft in Texas, I request that this aircraft be returned to Memphis Aviation, Inc., d/b/a as Hi-Air, Inc., and they will immediately repair same under the Cessna warranty, and certainly before the expiration date of the warranty, which is May 2, 1979.

Awaiting your response, . . .

The attorney for plaintiff responded by letter of April 19, 1979, which in material part states:

We have yours of April 16, 1979 requesting that the aircraft be taken to the Cessna dealer in the Texas area for repair under the Cessna warranty expiring on May 2, 1979.

As per your request, we intend to deliver the aircraft to the closest Texas Cessna dealer for warranty repair work. However, this delivery is undertaken only to accommodate Memphis Aviation d/b/a Hi-Air, Inc. in connection with the litigation and is not to be deemed in any manner a waiver of any rights that Mr. Haverlah might have with regard to his present pending action for rescission and damages, nor any other rights which Mr. Haverlah may have under the common or statutory law, including the Uniform Commercial Code.

Since we consider the aircraft to be the property of Hi-Air, Inc. we accede to your client's request regarding delivery and will seek recovery of any expenses incurred in connection with the delivery.

The record further indicates that at the time plaintiff's attorney wrote this letter, the airplane was being stored with Victor Teach who was employed by a Cessna dealer. Not only did plaintiff not attempt to make any delivery of the aircraft pursuant to the representations of the letter, but Teach was never informed concerning the Cessna warranty, nor instructed to inform his employer that warranty repairs were to be made. In view of the many problems outlined concerning the aircraft and the condition of the aircraft as indicated by Teach, it certainly seems logical that warranty repair work would be authorized to correct those deficiencies. Plaintiff, of course, had the opportunity to present the aircraft for warranty work and in fact represented to the defendants that he would do so. We can find no specific provision in the Uniform Commercial Code allowing for relief under such circumstances. In *Moore v. Howard Pontiac-American, Inc.,* 492 S.W.2d 227 (Tenn.App.1972), plaintiff sought rescission of a contract for the purchase of an automobile and the evidence showed that plaintiff used the automobile during the time that the defendant was making repairs under the warranty. The court pointed out that there was no specific provision for an offset in circumstances such as these, but noted that Tenn.Code Ann. § 47–1–103 provides:

*Supplementary general principles of law applicable.*—Unless displaced by the particular provisions of chapters 1 through 9 of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

The court held that the appellant-seller was entitled to an offset of a fair and reasonable use value of the automobile for the time the appellee-buyer made use of same. In so doing, the court said:

> In this case we are of the opinion, as insisted by appellant, that "complete justice and equity cannot be meted to the parties ... unless the (appellant) is allowed a fair and reasonable compensation for the (appellees;) use of the automobile."

*Id.* at 230.

■ We, like the court in *Moore v. Howard Pontiac-American, Inc., supra,* are of the opinion that complete justice and equity cannot be meted to the parties unless the defendants are allowed fair and reasonable compensation for any repairs that could have been made under the warranty had plaintiff lived up to his agreement. The record does not indicate the nature and extent of repair work needed under the warranty and therefore further proof will be necessary in this regard.

Accordingly, we modify the decree of the trial court to allow defendants credit for the value of any repairs authorized under the Cessna warranty, and the decree is affirmed in all other respects. The case is remanded for further proceedings consistent with this opinion and costs of appeal are adjudged one-half against plaintiff and one-half against defendants.

HIGHERS, J., and MATHERNE, Special Judge, concur.